**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JONI MATHIS,

        Plaintiff,

vs.                               Case No. 3:13-cv-1015-J-34JRK

CITY OF ST. AUGUSTINE BEACH,
a Florida Municipal Corporation,

        Defendant.

_____

### <u>ORDER</u>

      **THIS CAUSE** is before the Court on Defendant's Amended Motion for Summary

Judgment (A Dispositive Motion) with Supportive Memorandum of Law (Doc. 28; Motion) filed

on July 3, 2014.  Plaintiff Joni Mathis (Mathis) initiated this action against Defendant City of

St. Augustine Beach (the City) on July 13, 2012, by filing a complaint in the Circuit Court,

Seventh Judicial Circuit, in and for St. Johns County, Florida.  <u>See</u> Complaint and Demand

for Jury Trial (Doc. 1-1 at 17-26); <u>see</u> <u>also</u> Defendant's Notice of Removal ¶ 2 (Doc. 1;

Notice).   On August 19, 2013, Mathis filed in state court the Amended Complaint and

Demand for Jury Trial (Doc. 2; Amended Complaint).  <u>See</u> Notice ¶ 3.  The City removed the

action to federal court on August 21, 2013.  <u>See</u> <u>generally</u> Notice.  The Court thereafter

entered an order striking the Amended Complaint as an impermissible shotgun pleading.

<u>See</u> Order (Doc. 4).  On September 20, 2013, Mathis filed the Second Amended Complaint

and Demand for Jury Trial (Doc. 8; Second Amended Complaint) which is now the operative

pleading in this action.  In the Second Amended Complaint, Mathis alleges that the City

violated the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01 <u>et</u> <u>seq.</u>, by discriminating

against her on the basis of sex (Count I) and retaliating against her for engaging in statutorily protected conduct (Count II).  See generally Second Amended Complaint.  Additionally, Mathis brings a claim under 42 U.S.C. § 1983, alleging that the City discriminated against her on the basis of sex and in retaliation for her complaints of sex discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count III).  Id.  In the Motion, the City requests that the Court enter summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)).  See Motion at 1.  Mathis filed a response in opposition to the Motion on July 21, 2014.  See Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 29; Response).  With leave of Court, see Order (Doc. 32), the City filed Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 34; Reply), and Mathis filed Plaintiff's Response to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 35; Surreply).  Accordingly, the matter is ripe for review.

I.    **Background**[1]

Mathis worked for the St. Augustine Beach Police Department (SABPD) as the Assistant Police Chief from January 2, 2008, until October 27, 2009.  See Second Amended Complaint ¶ 5; Motion at 2.  Mathis applied for this position in September 2007, see Deposition of Joni Mathis at 66 (Doc. 28-17; Mathis Dep.), and SABPD Police Chief, Richard Hedges, hired her after an assessment which included presentations by three candidates,

---

[1] Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties.  For the purposes of resolving the City's Motion for Summary Judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to the nonmoving party. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).  The Court notes that these facts may differ from those ultimately proved at trial. Id.

see Declaration of Richard Hedges ¶ 7 (Doc. 28-2; Hedges Decl.).  There is some dispute in the record regarding whether Mathis was hired over a male candidate, Jerry Coxen, or whether she was the only candidate remaining when Hedges made the hiring decision. Hedges testified that of the three candidates, one candidate dropped out of the assessment, so his decision came down to two candidates - Mathis and a male candidate.  Id.; see also Deposition of Richard Hedges at 58 (Doc. 29-2; Hedges Dep.).[2]  Additionally, Coxen testified that "[a]t the end of the assessment" he "was advised that [he] was not the successful candidate."  Declaration of Jerry G. Coxen, Jr. ¶ 4 (Doc. 28-7; Coxen Decl.).  However, SABPD Sergeant Gary Hartshorne testified that Hedges told Hartshorne that the other two candidates for the assistant chief position "bowed out" leaving just one, who Hartshorne testified Hedges described as "a female, Joni Mathis, or something to that effect."  Deposition of Gary Hartshorne at 118 (Doc. 28-20; Hartshorne Dep.).  Further, Hartshorne testified that Hedges stated he wanted to "get four other people that were passed up" to "come in and do this employment process" because Hedges believed Mathis "would much rather . . . get this position, not through attrition, but through . . . winning it[.]" Id.; see also Mathis Dep. at 92 (testifying to this conversation between Hartshorne and Hedges).  Hedges also testified that it was true that "initially" he wanted to repost the assistant chief position.  Hedges Dep. at 60. Ultimately, however, Hedges did not repost the position and hired Mathis.  Hartshorne Dep. at 119.

---

[2] Hedges further testified that he "hired Mathis over a qualified male candidate, in part, because [he] felt that her gender would be an asset to the department."  Hedges Decl. ¶ 18.

A.      **Mathis's first year at SABPD**

In the chain of command at the SABPD, patrol officers report to sergeants, sergeants report to the assistant police chief, and the assistant police chief reports directly to the police chief. Hedges Decl. ¶ 6. As such, Mathis functioned in an executive supervisory position where she managed the SABPD's patrol division. Hedges Decl. ¶ 9; <u>see</u> <u>also</u> Assistant Police Chief Position Description (Doc. 28-2, Exhibit 4; Assistant Police Chief Position Description). At the time, the patrol division consisted of three sergeants who supervised one or two officers. Hedges Decl. ¶ 9; <u>see</u> <u>also</u> St. Augustine Beach Police Department Organizational Chart (Doc. 28-2, Exhibit 5; SABPD Organizational Chart).

Mathis received her first performance evaluation in January 2009. Hedges Decl. ¶ 10; <u>see also</u> St. Augustine Beach Police Department Supervisor Performance Evaluation Report (Doc. 28-2, Exhibit 6;[3] Doc. 28-18, Exhibit 5; Performance Evaluation).[4] Overall, Hedges gave Mathis a positive evaluation. <u>See generally</u> Performance Evaluation. However, under the heading, "Identify areas in which the employee can grow professionally[,]" one notation states, "Be sure to keep the Chief informed of noteworthy incidents (office injuries, damage to department equipment, high profile arrests, etc.)." <u>Id.</u> at 2. Hedges testified that he included this notation because he "had been concerned with several matters that Mathis had not advised [him] about that [he] felt were important." Hedges Decl. ¶ 10. For example, Mathis had not told Hedges about an on-the-job injury suffered by SABPD Officer Laurie

---

[3] It appears that the second page of the Performance Evaluation is missing from the copy submitted as Doc. 28-2, Exhibit 6. The complete Performance Evaluation is available in the copy submitted as Doc. 28-18, Exhibit 5.

[4] Mathis signed the Performance Evaluation on April 9, 2009. Performance Evaluation at 3.

Lucas, nor had Mathis told Hedges that she permitted SABPD Officer Todd Smith to drive a city marked vehicle when he was on light duty.[5] Id. Additionally, Hedges described another "communication issue with Mathis" involving a "budgetary matter." Id. ¶ 11. Specifically, Mathis wanted to buy a new mounting system for the scopes for department rifles, but Hedges told her to wait until he could locate the funding. Id. Mathis instead proceeded to purchase the mounting for one rifle, which was assigned to Lucas. Id.

### B.    Joni Mathis's and Todd Smith's relationship

In January 2009, Mathis suggested that Smith and Lucas, both of whom were injured, assist her in organizing the evidence room. Mathis Dep. at 141-43.[6] During this time, Mathis, Lucas, and Smith became friends. Id. at 110. Also during this time, Mathis began "counseling" Smith regarding several issues, including his difficulties over the death of a friend in law enforcement, his shoulder surgery, and marital issues with his wife.[7] Id. Specifically, Mathis explained that Smith's wife was having "psychological problems" and that

---

[5] Hedges explained that

> [i]f an officer was on light duty, this meant that he was not able to function in his regular law enforcement patrol role. For this reason an officer on light duty did not need to drive a police vehicle. Those vehicles were to be used by officers who were able to function in the patrol role. Moreover, it is city policy that employees who are on light duty are not to drive city vehicles.

Hedges Decl. ¶ 10.

[6] According to Hedges, Lucas was working light duty due to an on-the-job injury, and city policy permitted officers with on-the-job injuries to work light duties, but officers who were injured off-duty were not allowed to work light duty. Hedges Decl. ¶ 12. Because Smith was injured off the job, he was not eligible to work light duty. Id. However, Mathis pointed out that she needed assistance in organizing the evidence room. As a result, Hedges overruled the policy and allowed Smith to assist Lucas and Mathis in the evidence room. Id.

[7] Todd Smith's wife, Kelly Smith, is also a relevant actor in the factual background of this case. The Court will refer to Todd Smith simply as "Smith" but to Kelly Smith by both her first and last name.

Smith was thinking of getting a divorce. Id. at 112.  Mathis testified that she and Smith would discuss Smith's marital problems "[p]robably daily" while on the job at the SABPD. Id. at 116. According to Mathis, Smith asked that Mathis keep his martial problems and their discussions confidential. Id. at 112-13.  Thus, Mathis did not share with Hedges the information Smith relayed to Mathis regarding the problems he was going through because "in her view" the information "was private." Id. at 113.

### C.    Incident involving Todd and Kelly Smith on May 26, 2009

On the evening of May 26, 2009, Smith went to Mathis's home.  Mathis Dep. at 119. According to Mathis, they were both off-duty at the time, and she did not expect Smith. Id. at 109-10, 119.  Nevertheless, she allowed him in, and the two were sitting on her couch talking for 10 to 15 minutes when Smith's wife, Kelly Smith, arrived at Mathis's house and began banging on the door. Id. at 119.  Smith stepped outside, where Mathis could hear Kelly Smith asking, "Why are you here? Why are you talking to her?" Id. at 120.  Mathis testified that she watched Smith and his wife proceed down her front walkway and down the street, and although Kelly Smith was "animated," there was no violence. Id.  Once Mathis could no longer see Smith and his wife proceeding down the street, she began to shut down her house for the night. Id. at 126.

The Smiths however continued arguing, and their voices were loud enough for someone to call 911.  SABPD Administrative Inquiry 2009-073 at 1 (Doc. 28-4, Exhibit A; Administrative Inquiry).  Two St. Augustine Police Department (SAPD) officers responded to the area of 108 Anastasia Boulevard and located Smith and his wife in the rear parking lot of Auggie Dogs bar. Id.; Investigative Report #09-14477 at 2 (Doc. 28-2, Exhibit 7;

Investigative Report).  SAPD Officer Bryan Johnson was the first officer to arrive.  <u>See</u> Administrative Inquiry at 1; Interview of Bryan Johnson at 4-5 (Doc. 28-9; Johnson Tr.).  At that time, Kelly Smith was in her vehicle, screaming and crying, and Smith was standing outside the car at the driver's side window.  Johnson Tr. at 5-6.  Johnson pulled Smith to the side to separate him and Kelly Smith.  <u>Id.</u> at 6.  Then, Kelly Smith got out of her vehicle, approached Johnson, and said to Johnson, "Your chief is fucking my husband."  <u>Id.</u> at 7. When Kelly Smith realized that Johnson was with SAPD and not SABPD, she told Johnson that "the assistant chief of St. Augustine Beach . . . [was] fucking her husband[.]"  <u>Id.</u> at 8. Through his conversation with Kelly Smith, Johnson learned that Kelly Smith lived in Palm Coast, Florida, that Smith was a police officer with the SABPD, and that Kelly Smith drove to Mathis's home to find out whether Mathis and Smith were having an affair.  <u>Id.</u> at 9-11. Kelly Smith told Johnson that when she got to Mathis's house, she peered in the window, and saw her husband on top of and kissing Mathis.  <u>Id.</u> at 11; <u>see also</u> Investigative Report at 4.

Due to her emotional state, Kelly Smith was unable to drive herself home.  Johnson Tr. at 13.  She called her friend, Darlene Weiss, who worked at the Flagler County Sheriff's Office (FCSO), and asked Weiss for Lucas's phone number.  <u>See</u> Interview of Darlene Weiss at 3-6, 10-11 (Doc. 28-11; Weiss Tr.).  At the time, Lucas was Smith's supervisor and Mathis's subordinate.  <u>See</u> Interview of Laurie Federico Lucas dated 6-23-2009 at 17 (Doc. 28-13; Lucas Tr. 6-23-2009); <u>see</u> <u>also</u> Interview of Laurie Federico Lucas dated 6-15-2009 at 56-57 (Doc. 28-12; Lucas Tr. 6-15-2009).  She was also friends with Mathis, Smith, and Kelly Smith although she considered herself closest to Smith.  Lucas Tr. 6-15-2009 at 8-10, 52.  Indeed, Lucas was aware of the Smith's marital problems, and a "couple weeks" before

the May 26, 2009 incident, Smith "brought his guns to [Lucas's] house at about midnight because he came home" and Kelly Smith was "drinking, taking her Xanax, and just went ape – . . . went crazy . . . and tore the house apart and said she wanted to kill herself[.]" Lucas Tr. 6-15-2009 at 29.  Weiss called Lucas and told her to call Kelly Smith.  Lucas Tr. 6-15-2009 at 10.  After calling Kelly Smith and speaking with Johnson, Lucas drove from her home in Palm Coast, Florida, to St. Augustine, picked up Kelly Smith, and drove her home.  Lucas Tr. 6-15-2009 at 11-12, 16-17.  At some point during the drive, Kelly Smith began making "suicidal innuendos" and saying "I want to die.  I want to die.  I want to be in heaven with my daddy[.]" Lucas Tr. 6-15-2009 at 22, 26.  Later, Lucas called Weiss and told her that Kelly Smith wanted to "voluntarily go in for help, be Baker Acted."[8]  Weiss Tr. at 12-13.  She asked Weiss to call the FCSO since Kelly Smith and Lucas were in Flagler County at the time.  Lucas Tr. 6-15-2009 at 22; Weiss Tr. at 12.

FCSO Corporal David Edmonds was on duty on the evening of May 26, 2009, and received a message to call dispatch, which advised him that "Todd Smith's wife" was a "possible Baker Act that was on hold."  See Interview of David Edmonds at 5 (Doc. 28-14; Edmonds Tr.).  Edmonds then reported to Kelly Smith's house, where he was briefed by Lucas on the night's events.  Id. at 5-6.  Edmonds did not hear any suicidal threats from Kelly Smith herself; all of his information came from Lucas.  Id. at 7-8.  Edmonds arranged for FCSO Deputy Daniel Weaver to transport Kelly Smith from her home in Palm Coast to the Baker Act facility in Daytona Beach, Florida.  Id. at 9-10; see also Interview of Daniel Scott

---

[8] The Baker Act, Fla. Stat. §§ 394.451-.4789, is also known as "The Florida Mental Health Act." Fla. Stat. § 394.451.  The Baker Act provides for the involuntary commitment of a mentally ill person for treatment upon the state's showing of clear and convincing evidence of certain statutory criteria.  See Schexnayder v. State, 495 So.2d 850, 851 (Fla. 1st DCA 1986).

Weaver at 3-5 (Doc. 28-15; Weaver Tr.).  Weaver also never heard Kelly Smith make any threatening comments warranting a Baker Act commitment, and when he and Kelly Smith arrived at the Baker Act facility, the screener told Weaver that Kelly Smith did not meet "any of their admitting Baker Act criteria to allow her to be entered."  Weaver Tr. at 5.  However, when Kelly Smith was speaking with the screener at the Baker Act facility, Weaver heard her say "she would rather be dead than deal with what she was going through."  Id. at 6.  Based on this comment, Weaver Baker Acted Kelly Smith.  Id. at 6-10.

Approximately 20 minutes after Smith and his wife left Mathis's home on the evening of May 26, 2009, Smith returned and "apologized" saying he was "a little embarrassed" and that his wife was upset.  Mathis Dep. at 126.  At approximately 10:30-11:00 p.m., Kelly Smith called Mathis "yelling and screaming" things like "Why is . . . he at your house?  Why is he going to you?"  Id. at 126-127.  Mathis told Kelly Smith, "Don't call me back" and hung up on her.  Id. at 127.  Mathis maintains that at the time of the May 26, 2009 incident, she and Smith did not yet have a romantic relationship.  Id. at 126.

### D.    Chief Hedges is informed of the May 26, 2009 incident

In the early morning of May 27, 2009, SAPD Chief Loran Lueders alerted Hedges about the report taken by the SAPD on the evening of May 26, 2009, because the report involved three SABPD officers - Mathis, Smith, and Lucas.  Hedges Decl. ¶ 13; Declaration of Loran Lueders ¶¶ 4-5 (Doc. 28-5; Lueders Decl.).  At Hedges's request, Lueders sent Hedges the report generated from the incident.  Lueders Decl. ¶ 5.  The report includes the names of Smith, Kelly Smith, and Mathis.  See Investigative Report.  Lucas is not mentioned

by name in the report but is instead referred to as the "off[-]duty officer" who took Kelly Smith home.  See id.

On May 27, 2009, Mathis tried to call Smith around 10:00 a.m. or 11:00 a.m. but he did not answer.  Mathis Dep. at 127.  Later that day, Mathis called Lucas to see if Lucas had spoken with Smith.  Id. at 127-28.  During that conversation, Lucas informed Mathis about the events of the previous night: that the police were called and took a report, that Lucas took Kelly Smith home, and that Kelly Smith had been Baker Acted.  Id. at 128.  Mathis testified that she "had no idea all this had transpired."  Id. at 128.  After speaking with Lucas, Mathis immediately called Hedges's cell phone.  Id.  Hedges and Mathis have slightly differing accounts of what happened next.  Mathis testified that Hedges told Mathis that he was on his way to a meeting, and that she asked Hedges to call her when he got out of the meeting.  Id. Hedges testified that during this conversation, Mathis told him she wanted to talk to him in person but that he told her he had a commitment and would call her if he got done early, but otherwise, they could speak first thing the next morning before his 9:00 a.m. meeting. Hedges Decl. ¶ 14.

At approximately the same time that Mathis called Hedges on May 27, 2009, Lucas called Hedges.  Id.  Lucas told Hedges that Smith's wife had been Baker Acted, and Hedges began asking questions, but Lucas was "reluctant to say much or to provide details."  Id. Hedges asked where the Baker Act event happened, to which Lucas responded, "Flagler County."  Id.  Hedges then asked, "Where did all of this start?", to which Lucas responded, "At Joni's house - but nothing was going on."  Id.  Hedges testified, "At that point - it clicked for me because Joni Mathis had asked for me to allow Todd Smith to work with her on the

evidence room.  There clearly appeared to be the appearance of impropriety with the events of May 26, 2007 [sic]."  Id.

Mathis and Hedges have slightly differing accounts of their next conversation.  Mathis testified that Hedges did not call Mathis back on May 27, 2009, and Mathis did not try to call Hedges back on that date.  Mathis Dep. at 128.  Mathis testified that instead on May 28, 2009, Hedges's assistant called Mathis, and Mathis was then able to brief Hedges on the events of May 26, 2009.  Id. at 128-29.  Mathis testified that their conversation in which she relayed the events of May 26, 2009, took place on the phone.  Id. at 128-29.  Hedges testified that when he got to work on May 28, 2009, Mathis was not there, so they met later in the day, at which point Mathis told him about Smith's wife being Baker Acted.  Hedges Decl. ¶ 15.

### E.    Administrative Inquiry into the May 26, 2009 incident and Mathis's complaints of sex discrimination

On May 29, 2009, Hedges ordered an administrative inquiry into the events that transpired on the evening of May 26, 2009.  Hedges Dec. ¶ 16.  That same day, Hedges sent a memorandum to Mathis notifying her that he would be assigning an internal investigation with regard to her "alleged behavior."  May 29, 2009 Memorandum (Doc. 28-2, Exhibit 8; May 29, 2009 Memorandum).  In the May 29, 2009 Memorandum, Hedges states that he is the "complainant" on behalf of the City of St. Augustine Beach "based on a domestic incident at your residence on the night of Tuesday, May 26th involving you, Officer Miles T. Smith, and Officer Smith's wife, Kelly Smith."  Id.  Hedges continues,

> It was reported to me by Police Chief Loren Leuders [sic] that Mrs. Kelly Smith thought that her husband was having an extra marital affair so she went to your residence.  Reportedly, she caught you and Officer Miles Smith engaged in inappropriate conduct.  They walked away from your residence and a domestic altercation ensued in the area of 108 Anastasia Blvd.  Neighbors called the St.

> Augustine Police Department who responded to the scene and restored peace
> by separating them.

Id.

Hedges arranged for an independent agency, the St. Johns County Sheriff's Office

(SJCSO), to conduct the administrative inquiry.  Hedges Decl. ¶ 17; see also June 2, 2009

Letter (Doc. 28-2, Exhibit 9; June 2, 2009 Letter).  SJCSO Chief Deputy Joel Bolante

conducted the investigation.  See June 4, 2009 Memorandum (Doc. 28-2, Exhibit 10; June

4, 2009 Memorandum); Hedges Decl. ¶ 17.  Bolante began interviewing witnesses on June

4, 2009.  Administrative Inquiry at 3.  The Administrative Inquiry notice states the following:

> The purpose of this inquiry is to determine if an inappropriate relationship
> existed or currently exists between Assistant Chief Joni Mathis and Officer M.
> Todd Smith, both of the St. Augustine Beach Police Department.  It is widely
> accepted in the field of management that an intimate relationship between an
> executive staff member and a non-ranking subordinate member of a law
> enforcement agency could serve as a detriment to the reasonable supervision
> and proper discipline of the department.  Such relationship could compromise
> the credibility and reputation of the agency in the eyes of the community it
> serves.  Allegations that will be reviewed include:
>
> a)    **If an inappropriate relationship existed or currently exists between
>        SABPD Assistant Chief Joni Mathis and SABPD Officer Todd
>        Smith;**
>
> b)    **If the actions/inactions of Joni Mathis, as the Assistant Chief of the
>        SABPD, were appropriate and within the guidelines and
>        expectations of the Chief of Police and SABPD policy during the
>        evening of 26 May 2009;**
>
> c)    **If the actions of Ofc Todd Smith were appropriate and within the
>        guidelines and expectations of the Chief of Police and SABPD
>        policy during the evening of 26 May 2009;**
>
> d)    **If the Baker Act of Kelly Smith during the early morning hours of
>        27 May 2009 was a legitimate law enforcement action.**

Administrative Inquiry at 2.

Bolante questioned all relevant witnesses. See Declaration of Joel Bolante ¶¶ 7, 10 (Doc. 28-4; Bolante Decl.).  Initially, Kelly Smith refused to return Bolante's phone calls and instead submitted a handwritten sworn statement in which she contradicted and retracted the statements she made to the SAPD officers and Weiss on the evening of May 26, 2009.  See June 22, 2009 Letter (Doc. 28-4, Exhibit B; June 22, 2009 Letter).  However, Kelly Smith subsequently agreed to an interview with Bolante in which she reverted back to the original story she gave the SAPD officers on May 26, 2009, confirming that on the night of May 26, 2009, she saw Smith on top of and kissing Mathis.  See Investigative Supplement Report (Doc. 28-4, Exhibit C; Investigative Supplement Report); see also Bolante Decl. ¶ 11.

Bolante's investigation revealed that from March 2, 2009, to June 1, 2009, 147 calls were made from Mathis's cell phone to Smith's cell phone.  See Administrative Inquiry at 11. 100 of the phone calls were made while Smith was off-duty, six occurred while he was on sick leave, and one occurred while he was on vacation.  Id.  The remainder of the calls occurred while Smith was on-duty.  Id.  Bolante compared Mathis's calls to Smith with her calls to other SABPD officers and discovered that comparatively, Mathis called Smith a significantly greater number of times than other officers.  See id. at 11-13.  For example, during the period from May 2, 2009, to June 1, 2009, Mathis called most other officers between zero and four times, called Hedges three times, called Lucas 12 times, and called Smith's cell phone 65 times.  Id. at 11.  After discovering the large volume of phone calls between Mathis and Smith, but before interviewing Mathis, Bolante spoke with Mathis "as a professional courtesy" to inform her that he would be questioning her soon.  Bolante Decl.

¶ 8.  In response, Mathis told Bolante that "she was being singled out because of her gender and that the investigation 'would not even be happening' if she were a man, and that she had done nothing wrong." Id. Bolante immediately informed Hedges of Mathis's statements. Id.; see also Hedges Decl. ¶ 18.

On or about June 17, 2009,[9] Mathis expressed to Hedges that she wished to speak with St. Augustine Beach City Manager Max Royle.  See Mathis Dep. at 133, 176; Hedges Decl. ¶ 18.  Hedges told Mathis that if she wished to submit a complaint, city policy required her to do so in writing. Hedges Decl. ¶ 18.  Mathis then met with Royle and "reported to [him] that she felt that she was being singled out and treated differently by Chief Hedges because of her gender."  Declaration of Max Royle ¶ 8 (Doc. 28-1; Royle Decl.).  Mathis testified that she told Royle "that the Internal Affairs investigation against [her] would not be happening had [she] been a man, that the way [she] was being treated, [she] was being picked out because of [her] gender[.]"  Mathis Dep. at 177.  Royle reminded Mathis that "under City policies she was required to put her complaint in writing so that it could be investigated." Royle Decl. ¶ 8.  Hedges discussed his concerns regarding Mathis's complaints with the City's labor attorney, who recommended an investigation of Mathis's discrimination complaint. Hedges ¶ 19. Hedges then recommended to Royle that the City hire an attorney to investigate Mathis's claims.  Id.  On June 26, 2009, Royle approved funding to hire an attorney, Michael Grogan, to investigate Mathis's complaints.  Royal Decl. ¶ 8; see also Declaration of Michael Grogan ¶ 4 (Doc. 28-8; Grogan Decl.).  Grogan then contacted

_____

[9] Mathis alleges that her meeting with Hedges took place on June 17, 2009, see Second Amended Complaint ¶ 12, which the City does not appear to dispute, see Motion at 10 n.3.

Mathis's attorney to schedule an interview with Mathis.  Grogan Decl. ¶ 4.  However, Mathis was unwilling to speak with Grogan, so he never conducted the investigation.  Id. ¶ 5.  Mathis testified that she did not file any formal complaints against Hedges before Hedges initiated the internal investigation.  Mathis Dep. at 132.

On July 6, 2009, Bolante released the findings of his investigation, in which he concluded that the following facts were not in dispute:

a)  Joni Mathis, a senior executive officer with the SABPD, allowed a non-ranking, married subordinate experiencing marital problems into her home while off-duty;

b)  The spouse of the married non-ranking subordinate showed up at the house and caused a disturbance in her front yard;

c)  The disturbance was enough for a neighbor to call the police and a police report written (SAPD 2009-014477), creating a public record;

d)  AC Joni Mathis made no attempts to quell the disturbance, stating that the disturbance was a personal issue between Todd and his wife not requiring law enforcement action;

e)  AC Joni Mathis, among others involved in this inquiry, admitted to close, friendly and personal relationships with subordinates within the SABPD, which could adversely affect the reasonable supervision and proper discipline of the agency, which is thereby contrary to the best interest of the agency.

f)  Evidence from telephone records of agency issued cell phones for AC Mathis and Ofc Smith clearly corroborates a relationship that is more than professional or one that clearly exceeds normal or reasonable business association.

g)  AC Joni Mathis did not immediately notify her Chief in regard to this incident.

See Administrative Inquiry at 40-41.  The Administrative Inquiry further states that

[t]he facts and statements resulting from this inquiry could not prove or disprove that a sexual relationship existed or currently exists between Assistant

> Chief Joni Mathis and Ofc Todd Smith.   However, the facts do clearly demonstrate that Assistant Chief Joni Mathis, a senior executive officer within the SABPD, engaged in relationships with subordinate employees that exceed normal or reasonable business associations.   Such relationships can compromise the chain-of-command resulting in the appearance of partiality, favoritism, or otherwise undermine the good order, authority and proper discipline of the agency.   The SABPD does not have [a] policy prohibiting fraternization between supervisors and subordinates.

Id. at 41.  Ultimately, Bolante concluded that "the preponderance of evidence suggests that" Mathis violated St. Augustine Beach Police Department Policy, General Order 3, Standards of Conduct, Rules and Regulations for Conduct, Section E.2, Section F.9, and Section F.1. See id. at 41-42.  Section E.2 states, "No member/employee shall engage in any activity which is contrary to the best interest of the Police Department or law enforcement in general." Id. at 41.  Section F.9 states, "Performing any acts or making any written statements which tend to bring the Police Department into disrepute or ridicule, or which tend to interfere with the reasonable supervision and proper discipline of the Police Department." Id. Section F.1 states, "Failure of a member/employee to perform the duties of her rank of assignment." Id. at 42.[10]

On July 15, 2009, Hedges sent Mathis a memorandum advising her that Bolante completed the internal investigation and concluded that she had committed policy violations of Sections E.2, F.9, and F.1.  See July 15, 2009 Memorandum (Doc. 28-2, Exhibit 14; July 15, 2009 Memorandum).  Hedges scheduled a predetermination hearing for July 28, 2009, for the purpose of "receiving and considering [Mathis's] response" to help him determine what "specific action" to take in the matter.  See id.  Mathis attended the July 28, 2009 hearing with

---

[10] Mathis's violation of Section F.1 was based on "her inactions during the evening hours of 26 May 2009[.]" Administrative Inquiry at 42.

her attorney, at which time she was afforded the opportunity to provide additional information

for Hedges to consider before making his decision as to what disciplinary action to take.

Hedges Decl. ¶ 21.

### F.    Mathis's termination

#### 1.    August 12, 2009 Letter

On August 12, 2009, in a letter, Hedges informed Mathis of his intent to terminate her

employment and placed her on administrative leave with pay pending resolution of the

matter.  Hedges Decl. ¶ 22; see also August 12, 2009 Letter (Doc. 28-2, Exhibit 15; August

12, 2009 Letter).  Hedges further informed Mathis that he agreed with Bolante's conclusions

in the Administrative Inquiry as to Mathis's violations of Sections E.2, F.9, and F.1.  See

August 12, 2009 Letter at 1.  Additionally, Hedges explained his decision as follows:

> You have a pattern of not keeping me abreast of information that is available
> to you.  I told you on a couple of previous occasions that you needed to keep
> me better informed and noted it on your evaluation in January.  During this
> incident, you concealed your ongoing "counseling" of a subordinate from me
> for a couple of months and, apparently, had it not been for the incident at your
> residence, I may have never been made aware.  An integral part of your job
> duties is to keep me thoroughly informed and, based on your history; I can not
> trust you to do that.

Id. at 2.

In the August 12, 2009 Letter, Hedges also informed Mathis that she was entitled to

address his termination recommendation through a Complaint Review Board in accordance

with St. Augustine Beach Police Department Policy, General Order 2, Disciplinary and

Grievance Procedure.  See id. at 2.  According to this policy, the Complaint Review Board

"shall be convened for the purpose of hearing the facts and making a recommendation to the

Chief."  Id.  The Complaint Review Board would consist of "one member designated by the

-17-

Chief, one member designated by the aggrieved officer, and one member designated by the two designated members." Id.

### 2. Conversion of Mathis's paid administrative leave to leave without pay and termination

Mathis initially advised Hedges that she would be pursuing a hearing before a Complaint Review Board.  Hedges Decl. ¶ 27.  However, according to Hedges, "Mathis appeared to be dragging her feet in the Complaint Review process[.]" Id.  As a result, in a letter dated September 3, 2009, Hedges informed Mathis that because the Complaint Review Board process "has been taking longer than expected[,]" pursuant to Section XIV.8 of the City's Personnel Manual, he was converting Mathis's administrative leave to a suspension without pay effective that day. Id.; see also September 3, 2009 Letter (Doc. 28-2, Exhibit 16; September 3, 2009 Letter).  One day before the scheduled Complaint Review Board hearing, Mathis's attorney advised the City's attorney that Mathis would no longer be pursuing a hearing with respect to her termination. Hedges Decl. ¶ 27. The letter from Mathis's attorney dated October 26, 2009, states,

> Due to the City's failure to respond to my inquiry regarding recusal of Chief Hedges as stated in my letters of August 31, 2009 and October 20, 2009, and due to reports that Chief Hedges' has engaged in improper exparte communications with both members of the Complaint Review Board and material witnesses who would appear before the Complaint Review Board, we have concluded that it would be impossible for us to obtain a fair hearing in the matter.

See October 26, 2009 Letter (Doc. 28-17 at 148; October 26, 2009 Letter).

On October 27, 2009, Hedges informed Mathis that her employment with the City was terminated, effective that same day.  See October 27, 2009 Letter (Doc. 28-2, Exhibit 17;

October 27, 2009 Letter); <u>see also</u> Hedges Decl. ¶ 27.  Mathis did not appeal her termination to the City Commission.  Mathis Dep. at 157-58.

### 3.  Hedges's failure to follow the City's progressive disciplinary policy

Prior to her termination, Hedges had never taken any disciplinary action against Mathis and had not written Mathis up prior to the initiation of the internal affairs investigation. Hedges Dep. at 29, 35.  Although the City of St. Augustine Beach has a progressive disciplinary policy, Hedges testified that there are some cases and some violations where the City does not use the progressive disciplinary policy.  <u>Id.</u> at 36-37.  However, Hedges was unable to name any other employee besides Mathis who was terminated without following the progressive disciplinary policy.  <u>Id.</u> at 38.  When asked why he did not impose the progressive disciplinary policy in Mathis's situation, Hedges testified that he did not do so because he "believed that the Assistant Chief's behavior was not going to change."  <u>Id.</u> at 40.

### 4.  Hedges's reasons for Mathis's termination and comments to Edward George and Barry Tuttle

City Commissioner Edward George spoke with Hedges after Hedges had learned the results of the Administrative Inquiry and decided to terminate Mathis.  <u>See</u> Deposition of Edward George at 11-14 (Doc. 29-10; George Dep.).  Their conversation began with a discussion of "the phone log" in the Administrative Inquiry, and that Hedges told George that "because there's all this – what [Hedges] considered an inordinate amount of phone calls between Joni and this officer, that that was – that was grounds for termination."  <u>Id.</u> at 13-14. George then said to Hedges, "I don't understand that[,]" to which Hedges responded, "Obviously – well, they're having a relationship."  <u>Id.</u> 14.  In response, George inquired, "So,

you're terminating her because she has phone calls. She started making phone calls to one of the other officers?", and Hedges responded, "Yeah." Id. at 11.  George then said, "Well, is she influencing his position or – or giving him undue privilege somehow?", to which Hedges responded, "No." Id. at 11-12.  George then brought up Hedges's close relationship with the mayor, Frank Charles, which Hedges countered as being "different." Id. at 12.  George told Hedges he "didn't think" terminating Mathis "was a good idea."  George Dep. at 12. According to George, Hedges responded, "That's what I get for hiring a woman." Id.  George was "stunned" and asked, "What do you say?", to which Hedges again stated, "That's what I get for hiring a woman." Id. at 13.  Similarly, Barry Tuttle, an individual involved in the St. Augustine Beach community, testified that he and Hedges were discussing Mathis's termination, and the first thing Hedges said to him was, "Well, that's what I get, Barry, for hiring a woman."  See Deposition of Barry Tuttle at 6-8, 10-11 (Doc. 29-11; Tuttle Dep.).

At Mathis's unemployment compensation hearing, Hedges testified that he discharged Mathis for "[v]iolation of policy" and then recited the three policies noted in the Administrative Inquiry.  See Mathis Unemployment Compensation Hearing Transcript at 4 (Doc. 29-1: Mathis Unemployment Compensation Hrg. Tr.).  When asked specifically what Mathis "did", Hedges responded:

> Basically, there was an incident between her and another officer at her residence where she was reportedly counseling him and failed to notify me of the situation which was going on, and the police department was called when the officer's wife showed up at the residence.
>      The incident moved from her residence around to the corner when the police department, the St. Augustine Beach Police Department was called. And then I wasn't notified of the incident by her for, I believe it was a day or so.

Id. at 4-5.  When asked what specific conduct Mathis engaged in which led Hedges to conclude that she violated the Policy Section E.2, Hedges responded:

> By not notifying me of the ongoing issue with the law enforcement officer that she had knowledge of and . . . [t]he issues with the officer in regards to going through his divorce and having some problems with that, to the point where he relieved himself of his weapons to another officer. And she had been counseling him reportedly for a couple of months and had not been informing me of any of those decisions or the incident that we're referring.

Id. at 8-9.  When asked what conduct Mathis engaged in to violate Policy Section F.9, Hedges responded: "By not keeping me properly informed.  The incident occurred when the officer came to her house, which reportedly was unannounced, and another law enforcement agency had to be called due to the altercation that occurred from that."  Id. at 14.  Further, Hedges explained,

> [Mathis] allowed an incident to occur at her residence where had she kept me informed, had she made a better decision not to have the officer come to her house to talk about personal issues, that incident may not have occurred, therefore, another law enforcement officer would not have come to that – that area to investigate the incident.

Id. at 15.  Hedges further summarized that his concern was "two-fold": that Mathis did not keep him informed regarding her counseling of Smith and that Mathis allowed the incident on May 26, 2009, to occur by allowing Smith to come to her residence to discuss personal issues.  Id. at 15-16.  Finally, with regard to Policy Section F.1, Hedges explained that Mathis's conduct violated this provision because of "the incident and the totality."  Id. at 16-17.  Hedges further reiterated his issues with Mathis's lack of communication and stated that he believed that Smith needed professional counseling but "obviously something must have clouded her judgment[.]"  Id. at 17.

At his deposition, Hedges testified that the reason he terminated Mathis was for not keeping him informed.  Hedges Dep. at 19.[11]  Hedges also testified that "[t]here had been other issues" but not keeping him informed was "the main reason" Id.  Specifically, Hedges stated he and Mathis "basically had not been getting along."  Id. at 20.

In his declaration, Hedges testified that he "agreed with Bolante's conclusions as to the numerous policy violations that Mathis had committed."  Hedges Decl. ¶ 22.  Hedges further testified,

> I was especially troubled by Mathis's pattern of failing to advise me of important information.   I was also troubled by the fact that Mathis claimed to be confidentially "counseling" Ofc. Smith over a period of months.  Mathis had not notified me of this.  She had not even told Smith's supervisor, Ofc. Lucas, who (according to the IA interview) had removed guns from Smith's house.  Before the May 26, 2009 incident, our department had a female sworn officer who was experiencing some mental health issues.   In that situation Mathis had immediately referred the officer to a psychologist for Employee Assistance Program (EAP) counseling.   In Todd Smith's case, Mathis personally counseled Smith for 3 months without telling anyone else.  Worse, at least one of these "counselings" occurred in her home.

Id. ¶ 23.  Hedges further testified, "I was troubled by Ms. Mathis's judgment on how she handled this matter.  It should have been immediately brought to my attention." Id. ¶ 24. Notably, Hedges testified that he "did not base any part of [his] decision to discharge Mathis on the testimony of Kelly Smith due to the inconsistencies of her statements." Id. ¶ 25. Further, Hedges testified that he "understood that Bolante's investigation did not prove that Mathis had an affair with Todd Smith." Id.  Instead, Hedges testified that as indicated in the August 12, 2009 Letter, his "chief concern was Mathis' three major policy violations as found

---

[11] When asked of what incidents Mathis failed to inform him, Hedges mentioned Lucas's injury, giving Smith an unmarked police car while on light duty, an incident where Mathis purchased or had Lucas purchase parts for a weapon, and the issues for which Smith sought Mathis's "counseling". Hedges Dep. at 22-23.

by Bolante, her utter failure to communicate with [him] and the safety issues that were created by Mathis's poor judgment." Id.

### G.    Comparator Evidence

Mathis alleges that Hedges "consistently treated female officers differently than male officers regarding the initiation of internal affairs investigations and imposing disciplinary action", see Second Amended Complaint ¶¶ 14, 33, and points to Hedges's treatment of Officer Rhett Mobley, Sergeant Joe Beaudoin, and Smith as evidence of that Hedges's stated reasons for her termination are pretextual, see id. ¶¶ 12-14, 31-33; Response at 16-17.[12]

Mobley was a "sworn officer" assigned to the FDLE Drug Task Force, a regional unit comprised of officers from various agencies. Hedges Decl. ¶ 9. Although Mobley's position was "lateral" to that of Mathis in the sense that Mobley reported directly to Hedges, Mobley did not act in a supervisory role. Mathis Dep. at 83-85; Hedges Decl. ¶ 9.[13] Mobley violated the rule of sequestration during a jury trial in Putnam County, Florida,  and promptly reported this infraction to Hedges. Id. ¶ 33.[14] Hedges assigned the investigation of Mobley's infraction to Mathis. Id.[15] Mathis's investigation revealed that Mobley and a Putnam County deputy

---

[12] Mathis's argument with respect to Smith is limited to that fact that she was placed on unpaid administrative leave after four weeks of paid administrative leave whereas Smith was on paid administrative leave for four months before being converted to leave without pay. Mathis Dep. at 102.

[13] Hedges testified that Mathis outranked Detective Bill Bolena and Mobley even though all three individuals reported directly to Hedges. Hedges Decl. ¶ 9. Mathis testified that although she and Mobley "had different functions, [they] were in the same line" and they "were all lateral." Mathis Dep. at 85. Thus, it appears there may be a disputed fact as to whether Mathis outranked Mobley.

[14] Mathis testified that Mobley called Hedges "that afternoon or the next day" and told him what happened. Mathis Dep. at 97.

[15] Hedges assigned Mathis the investigation 19 days after Mobley's infraction. Mathis Dep. at 98.

had, in fact, discussed facts during a trial in violation of the rule of sequestration.[16]  Id.  Mathis recommended the issuance of a written reprimand to Mobley and a transfer in assignment.  Id.; see also May 14, 2009 Memorandum (Doc. 28-2, Exhibit 22; May 14, 2009 Memorandum).  Hedges agreed with the written reprimand but declined to transfer Mobley at that time.  Hedges Decl. ¶ 33; see also June 9, 2009 Letter (Doc. 28-2, Exhibit 23; June 9, 2009 Letter).  Mathis and Hedges have differing accounts for why Hedges declined to transfer Mobley.  Hedges testified that he declined to transfer Mobley because the drug task force supervisor advised that Mobley was involved on an important case.  Hedges Decl. ¶ 33.  According to Mathis, however, Hedges told Mathis that he decided not to transfer Mobley because he wanted to wait until December, which was a more convenient time since Mobley was still going to college.  Mathis Dep. at 99.

Mathis also cites Beaudoin as a comparator.  Beaudoin sent photos of his genitalia to Mrs. Crouse, a married woman, with whom he was having an affair.  Hedges Decl. ¶ 32.[17]  Mrs. Crouse's husband complained to Hedges about Beaudoin's actions, and Hedges tried to interview Mr. Crouse, but his attempts were unsuccessful.  Id.  Nevertheless, in light of Beaudoin's misconduct, Hedges conducted an internal investigation during which Beaudoin was not suspended.  Id.; see also Internal Investigation IA#078 (Doc. 28-2, Exhibit 18; Beaudoin Internal Investigation); Deposition of Joe Beaudoin at 23 (Doc. 29-9; Beaudoin

---

[16] Hedges testified that it was his understanding that when questioned by the trial judge, the Putnam County deputy denied the conversation, and Mobley admitted the conversation.  Hedges Decl. ¶ 33.  Mathis's testimony is the same.  Mathis Dep. at 97.

[17] Beaudoin sent Mrs. Crouse the lewd photos when he was off-duty, on his phone that he purchased.  Hedges Decl. ¶ 32.  The City paid for the phone use but not the texts.  Id.  Beaudoin paid for texting and for personal use of the phone.  Id.

Dep.).  At the conclusion of the internal investigation, Hedges disciplined Beaudoin with a

written counseling.  Hedges Decl. ¶ 32; October 3, 2011 Memorandum (Doc. 28-2, Exhibit

19; October 3, 2011 Memorandum).[18] Mathis outranked and supervised Beaudoin, who was

part of the Patrol Division.  See Hedges Decl. ¶ 9; see also SABPD Organizational Chart.[19]

---

[18] The "Findings of Fact" of Beaudoin's internal investigation were the following:

- Sgt. Beaudoin and Mrs. Crouse have a close consensual relationship.

- Sgt. Beaudoin has not threatened any member of the Crouse family.

- Sgt. Beaudoin has sent personal text messages and photos to Mrs. Crouse on her personal cell phone which he intended only for her.  Some of these photos sent by Sgt. Beaudoin were of his penis and scrotum.

- Mr. Crouse viewed, copied and distributed the text messages and photos to, at a minimum, Mayor O'Brien and Chief Hedges which are included in the IA folder.

- It could not be determined what device Sgt. Beaudoin used to take the photos or what device he used to send the photos.

See Beaudoin Internal Investigation at 4.  The investigation concluded:

> The allegation that Sgt. Beaudoin has sent lewd and inappropriate messages to Angela Crouse is SUSTAINED.  Although Mrs. Crouse did not object to Sgt. Beaudoin sending her photos of his penis and scrotum, it is inappropriate as she is a married woman living with her husband/family and once sent there is no control over the viewing and distribution as evidenced by them being printed and distributed by a third party (Mr. Crouse).  Since police officers are held to a higher standard and photos circulating of an officer's penis and scrotum are embarrassing, this does reflect negatively on the police department, therefore, this is a violation of St. Augustine Beach Police Department General Order 3, Standards of Conduct, Section F 17 - Conduct unbecoming an officer.

Id. at 4-5 (emphasis in original).

[19] The record reveals that Beaudoin may have a history of other instances of misconduct. At another point in time, Sergeant Hartshorne was dispatched to locate Mrs. Crouse and discovered Beaudoin and Mrs. Crouse in a hotel room. See Hartshorne Dep. at 61-67.  Beaudoin admitted that although Hedges advised him to end his relationship with Mrs. Crouse, he had no intention of doing so and kept his intentions hidden from Hedges.  Beaudoin Dep. at 29-31.  Additionally, at another point in time, a woman at a barbeque restaurant complained that Beaudoin placed money down the front of her

(continued...)

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[20]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[19](...continued)
shirt.  See id. at 14-17; see also Hartshorne Dep. at 148, 150-52.  Another instance of misconduct occurred when a woman named Shannon Bohme lodged a sexual harassment complaint against Beaudoin based on a lewd gesture.  Hartshorne Dep. at 150-51.

[20] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.   In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Applicable Law

### A.    Sex Discrimination under the Florida Civil Rights Act

Section 760.10(1)(a) of the FCRA provides that:

> It is an unlawful employment practice for an employer . . . [t]o discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

Fla. Stat. § 760.10(1)(a). Because the FCRA is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Florida courts follow federal case law when examining

FCRA discrimination claims. <u>Valenzuela v. GlobeGround North Am., LLC</u>, 18 So.3d 17, 21 (Fla. 3d DCA 2009); <u>see</u> <u>also</u> <u>Dep't of Children and Family Servs. v. Garcia</u>, 911 So.2d 171, 172-75 (Fla. 3d DCA 2005). Accordingly, "[it] is well settled law that Florida courts follow the three-part framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, for establishing, by circumstantial evidence, a discrimination claim based on disparate treatment in the workplace." <u>Valenzauela</u>, 18 So.3d at 21-22 (footnotes omitted) (citing cases).[21]

When relying on the <u>McDonnell Douglas</u> framework to support a claim of discrimination, the plaintiff bears the initial burden of establishing a <u>prima</u> <u>facie</u> case of discrimination. A plaintiff establishes a <u>prima</u> <u>facie</u> case of discrimination by showing: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue." <u>Rice-Lamar v. City of Ft. Lauderdale, Fla.</u>, 232 F.3d 836, 842-43 (11th Cir. 2000); <u>see</u> <u>also</u> <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). "To make a comparison of the plaintiff's treatment to that of [an employee outside plaintiff's protected class], the plaintiff

---

[21] Mathis does not suggest that she has presented direct evidence of intentional discrimination. A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude." <u>Hill v. Metro. Atlanta Rapid Transit Auth.</u>, 841 F.2d 1533, 1539 (11th Cir. 1988), <u>amended on reh'g on different grounds</u>, 848 F.2d 1522 (11th Cir. 1988). "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" <u>Hinson v. Clinch Cnty., Ga. Bd. of Educ.</u>, 231 F.3d 821, 827 (11th Cir. 2000)(citation omitted). However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. <u>Carter v. City of Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989). There is evidence that at the time surrounding Mathis's termination, Hedges remarked to at least two people, "That's what I get for hiring a woman." <u>See</u> George Dep. at 12; <u>see</u> <u>also</u> Tuttle Dep. at 10-11. However, Mathis appears to rely on these comments exclusively as circumstantial evidence which she argues establishes pretext. <u>See</u> Response at 17, 17 n.8 & n.9.

must show that [she] and the employee[ ] are similarly situated in all relevant respects." Holifield, 115 F.3d at 1562.  If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than herself, "summary judgment is appropriate where no other evidence of discrimination is present."  Id.

Significantly, with respect to the second prong of the prima facie case, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).  Rather, "an employee must show a serious and material change in the terms, conditions, or privileges of employment."  Davis, 245 F.3d at 1239; see also Crawford v. Carroll, 529 F.3d 961, 974 n.14 (11th Cir. 2008) (noting that the broader standard applicable in retaliation claims has no application to substantive Title VII discrimination claims).  While a plaintiff is not required to prove "direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  Davis, 245 F.3d at 1239.  "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  Id.; see also Holland v. Gee, 677 F.3d 1047, 1057 (11th Cir. 2012); Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 970 (11th Cir. 2010).  "Otherwise . . . every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Doe v. DeKalb Cnty. Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (internal quotations omitted).

If the plaintiff presents a prima facie case, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). If the defendant meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." Burdine, 450 U.S. at 256; Alvarez, 610 F.3d at 1264; Holifield, 115 F.3d at 1565 ("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]." Alvarez, 610 F.3d at 1264.

### B.    Retaliation under the Florida Civil Rights Act

Section 760.10(7) of the FCRA provides that:

It is an unlawful employment practice for an employer . . . to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

Fla. Stat. § 760.10(7).  The FCRA's retaliation provision "is almost identical to its federal counterpart" under Title VII. Carter v. Health Mgmt. Assocs., 989 So.2d 1258, 1262 (Fla. 2d DCA 2008).  As such, as with discrimination claims under the FCRA, "Florida courts follow federal case law when examining FCRA retaliation claims." Id.; see also Hinton v. Supervision Int'l, 942 So.2d 986, 989 (Fla. 5th DCA 2006).  To establish a prima facie case of retaliation under the FCRA, "a plaintiff must demonstrate: (1) that he or she engaged in statutorily protected activity; (2) that he or she suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity." Blizzard v. Appliance Direct, Inc., 16 So. 3d 922, 926 (Fla. 5th DCA 2009) (citing Harper v. Blockbuster Entm't Corp, 139 F.3d 1385, 1388 (11th Cir. 1998)).  As with a substantive sex discrimination claim, if an employer articulates legitimate reasons for its actions, a plaintiff must then "'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'" See McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999)).  To establish pretext, a plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)).

## C.     42 U.S.C. § 1983

"To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived her of a right secured under the Constitution or federal law and (2) that

such a deprivation occurred under color of state law."[22] Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998), as amended May 28, 1998. "The Equal Protection Clause ensures a right to be free from intentional discrimination based upon . . . gender[.]" Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003) (citations and footnote omitted). As such, the Eleventh Circuit Court of Appeals has "recognized an equal protection right to be free from employment discrimination, . . . and [has] found various . . . gender-based employment decisions by public officials, including those concerning discipline, promotions, transfers, reclassifications, and termination, in violation of that constitutional right[.]" Id. (citations omitted). "[L]iability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose." Reynolds v. Barrett, 685 F.3d 193, 204 (2d Cir. 2012). As Mathis "attempts to prove discriminatory intent by circumstantial evidence," her § 1983 claim, like her FCRA discrimination claim, is "subject to the McDonnell Douglas methods of proof." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005).

## IV.   Analysis

### A.   Municipal Liability under 42 U.S.C. § 1983

In the Motion, the City argues that Mathis's claims under 42 U.S.C. § 1983 fail as a matter of law because municipal liability cannot attach on the basis of respondeat superior. Motion at 24. The City contends that Mathis's claims are directed at the actions of Hedges, yet the "final policymaker" for Mathis's termination decision was the City Commission, to

---

[22] Eleventh Circuit precedent establishes that a "person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) (citation omitted).

whom Mathis had the right to appeal her termination. Id. at 24-25.  The City argues that

because Mathis chose not to appeal her termination to the City Commission, "her termination

did not result from City policy, nor was it made by the city policymaker and her § 1983 claim

fails as a matter of law." Id. at 25.

This Court has original jurisdiction over Mathis's federal claims under § 1983, see 28

U.S.C. § 1331, and supplemental jurisdiction over Mathis's FCRA claims, see 42 U.S.C. §

1367(a).  See United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  However, §

1367(c)(3) gives a court discretion to remand to state court a removed case involving

supplemental claims if "the district court has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3); see also Cook ex rel. Estate of Tessier v. Sheriff of

Monroe Cnty., Fla., 402 F.3d 1092, 1123 (11th Cir. 2005) (stating that "[b]ecause no basis

for original federal jurisdiction presently exists," the district court should remand the remaining

state law claim if it declines to continue to exercise supplemental jurisdiction).  Indeed, the

Eleventh Circuit has indicated that a district court may properly decline to exercise jurisdiction

over supplemental state law claims when the federal claims over which the Court had original

jurisdiction are dismissed on a motion for summary judgment.  See Hicks v. Moore, 422 F.3d

1246, 1254-55, 1255 n.8 (11th Cir. 2005) (after granting summary judgment on all federal

claims in favor of the defendant, the Eleventh Circuit noted the district court's discretion in

whether to remand the plaintiff's supplemental state law claims); Graham v. State Farm Mut.

Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary

judgment, the court sees no reason why the other claims should not be dismissed or

remanded pursuant to 28 U.S.C. § 1367(c)(3).").  As the Court's subject matter jurisdiction

over this action hinges on Mathis's § 1983 claims, the Court will first address the issue of municipal liability before turning to the merits of her discrimination and retaliation claims.

The Supreme Court of the United States has soundly rejected the theory of respondeat superior as a basis for liability in 42 U.S.C. § 1983 actions. See Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978).  Instead, a county or municipality may be liable in a § 1983 action "only where the municipality itself causes the constitutional violation at issue."  Cook ex. rel. Estate of Tessier, 402 F.3d at 1115 (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the municipality was the "moving force" behind the alleged constitutional deprivation. See Monell, 436 U.S. at 693-94. The Supreme Court has further clarified that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).  In a later case, "a plurality of the Supreme Court held that 'appointing authorities' who have authority to initiate personnel decisions are not municipal policymakers if those decisions are subject to meaningful administrative review." Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 129-30 (1988)).  Indeed, the Eleventh Circuit has "consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."  Id. (citing cases).  Notably, "the identification of the final policymaker is a question of state law for the trial judge, not the jury."  Mandel v. Doe, 888 F.2d 783, 793 (11th Cir. 1989).  "In making this determination, the court should

examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." Id.

City Manager Royle testified that "[u]nder the City's Personnel Policies that were in effect when Ms. Mathis was employed at the City of St. Augustine Beach, Ms. Mathis had the right to appeal her discipline, which in this case was a termination of employment, to the City Commission." Royle Decl. ¶ 11. Indeed, under the heading, "Discharge, Suspension or Demotion of Permanent Full and Part-Time Employees," The City of St. Augustine Beach Personnel Manual provides:

> Within five (5) days of the City Manager/Chief of Police decision, the employee may make written request, via the City Manager, Chief of Police for an appeal hearing of the City Manger's/Chief of Police's decision. The appeal hearing shall be held by the City Commission. The hearing shall be held within a reasonable time, and a record of the hearing shall be made. The City Commission shall uphold or overrule the City Manager/Chief of Police's decision.

City of St. Augustine Beach Personnel Manual § XIV.4.I. at 44 (Doc. 35-1; Personnel Manual). However, in his deposition, Royle testified that the chief of police has the "sole authority to hire and fire police department employees" and that the chief's decision to hire and fire "does not have to be approved by any other individual[.]" Deposition of Bruce Maxwell Royle at 23 (Doc. 29-8; Royle Dep.). Additionally, Royle acknowledged that the chief of police has the sole authority "to determine whether to take disciplinary action against any of his subordinates in the police department" and that "the chief's decision[ ] with regard to disciplinary action[ ] is not required to be approved by [Royle], the city commission, or anyone else[.]" Id. at 29.

In a similar vein, City Commissioner George testified that his "understanding" was that "the chief of police [has] the full and complete authority to decide who to terminate and who not to terminate in the police department[.]"  George Dep. at 10.  Further, although Hedges discussed with George his decision to terminate Mathis, George testified that "[w]e didn't have the power to . . . stop him" and that he did not "think [the City Commission would have] the power to not fire [Mathis.]"  Id. at 12, 15.[23]  Additionally, City Commissioner Undine Pawlowski testified that she did not "believe" the City Commission has "the authority to either hire or fire . . . any employees that are subordinate to the police chief in the police department[.]"  See Deposition of Undine Pawlowski at 4, 6 (Doc. 29-12; Pawlowski Dep.).  Instead, Pawlowski testified that the City Commission has authority over reductions in force in the police department, which would "incidentally" result in terminations, but she believed "terminating positions . . . is different from firing."  Id. at 7.

The record contains ample support for the conclusion that Hedges's decision to terminate Mathis was legally operative without review by the City Commission.  However, the question before the Court is not whether Hedges's decision was legally operative but whether it was subject to meaningful review.  The City's Personnel Manual appears to provide an avenue for such review through an appeal to the City Commission which "shall uphold or overrule the City Manager/Chief of Police's decision."  Personnel Manual § XIV.4.I. at 44.[24]

---

[23] George further testified that although the City Commission had the power to fire the police chief, they did not have the power to "fire or hire the assistant chief."  George Dep. at 21.

[24] Additionally, as raised by Mathis in the Surreply, the Personnel Manual also contains a provision stating: "A decision to discharge any police officer must be confirmed by the City Commission.  Pending such confirmation, a police officer may be suspended without pay by the Chief of Police."  Personnel Manual § XIV.8(A)(2) at 46.  This provision also appears to suggest that Hedges's decision was subject to meaningful review.

However, Mathis argues that the City failed to produce evidence that this policy was in effect at the time of Mathis's termination.  Response at 19.  Indeed, the Court observes that the copy of the Personnel Manual filed in the record was adopted in 2011, and Mathis's termination took place in 2009.  The City contends that this policy was in place during Mathis's employment and cites Royle's declaration, as well as Resolution 06-04 (Doc. 34-1; Resolution) to support this argument.  Reply at 1.  However, the portion of Royle's declaration cited by the City simply refers to an excerpt from the Personnel Manual which appears to be from the 2011 version and gives no indication of which version of the Personnel Manual the excerpt is taken.  See Royle Decl.  ¶ 11 (citing Exhibit E).  Further, the Resolution, dated May 1, 2006, simply states that the City Commission "affirms the adoption of the City's revised Personnel Manual[.]" See Resolution.  This evidence fails to establish that the policy at issue was included in the version of the Personnel Manual adopted on May 1, 2006, or whether the Personnel Manual adopted on that day was the same Personnel Manual in place in 2009.  Moreover, although Mathis received a copy of "the City's policy book" when she was hired, see Deposition of Joni Mathis dated April 15, 2014 at 9-10 (Doc. 28-18; Mathis Dep. dated 4-15-2014), the evidence fails to address whether the policy at issue was included in the "policy book" at that time.  And Hedges's letters notifying Mathis of his intent to terminate her employment and notifying Mathis that her employment was terminated do not include any reference to her right to appeal his decision to the City Commission.  See August 12, 2009 Letter; October 27, 2009 Letter.  On this record, the Court cannot determine, as a matter of law, whether Hedges's decision to terminate Mathis was subject to meaningful review sufficient to impose municipal liability on the City under § 1983.  Specifically, the testimony

of Royle, George, and Pawlowski, as well as the ambiguity in the record with regard to whether the Personnel Manual policy at issue was in place in 2009, create a genuine issue of material fact to be decided by the Court at trial.  Accordingly, the Court will address the merits of Mathis's claims under the FCRA and § 1983.

### B.    Counts I and III: Sex Discrimination under the Florida Civil Rights Act and 42 U.S.C. § 1983

In the Second Amended Complaint, Mathis asserts a myriad of complaints stemming from her tenure as assistant police chief.  To support her claim of sex discrimination, Mathis appears to rely on the following: (1) Hedges's "reluctance" to hire Mathis "when the only remaining candidate, a male, withdrew from consideration"; (2) Hedges's "demeaning and confrontational" communications with Mathis, as compared with his communications with male subordinate officers; (3) Hedges's "initiation and supervision" of an internal investigation into the events of May 26, 2009; (4) Hedges's decision to convert Mathis's paid administrative leave to suspension without pay; and (5) Hedges's termination of Mathis's employment.  See Second Amended Complaint ¶¶ 6-8, 13-15, 24-26, 32-34.[25]  However, based upon Mathis's

_____

[25] The Court takes this opportunity to note the indiscriminate manner in which Mathis's counsel has drafted the Second Amended Complaint wherein counsel has included all factual allegations relevant to Mathis's sex discrimination and retaliation claims under the headings of each of the three Counts.  See generally Second Amended Complaint.  In the future, counsel for Plaintiff would be well advised to consider the Eleventh Circuit's admonishment in Palmer v. Albertson's LLC, 418 F. App'x 885 (11th Cir. 2011).  See Palmer, 418 F. App'x at 889 ("Where a plaintiff has alleged a host of claims based on discrete facts of discrimination in just one count, we have noted that the plaintiff failed to comply with Rules 8 and 10." (citing Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 980, n. 57 (11th Cir. 2008))); see also Baker v. City of Safe Harbor, Fla., No. 8:07-cv-1120-T-23TGW, 2008 WL 4200147, at *7-8 (M.D. Fla. Sept. 12, 2008).

Additionally, the Court admonishes Mathis's counsel for improperly combining two distinct discrimination claims - disparate treatment and retaliation - in Count III, contrary to the provisions of Rule 8 and 10(b).  See Second Amended Complaint at 10-16.  Rule 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 10(b) states in pertinent part:

(continued...)

Response, it appears that Mathis relies solely on her termination as the actionable adverse employment action with regard to her claims of intentional discrimination under the FCRA and the Equal Protection Clause in that she argues that the other events constitute evidence of disparate treatment.[26]  See Response at 13-17.  Accordingly, the Court will limit its analysis

---

[25](...continued)
A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence - and each defense other than a denial - must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).

These rules work together "to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not."

Fikes v. City of Daphne, 79 F.3d 1079, 1082 (11th Cir. 1996) (citation omitted).  Thus, where a plaintiff asserts multiple claims for relief, a properly drafted pleading "will present each claim for relief in a separate count, as required by Rule 10(b)."  Anderson v. Dist. Bd. of Trs. of Central Fla. Cmty. College, 77 F.3d 364, 366 (11th Cir. 1996); see also e.g. Palmer, 418 F. App'x at 889; Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (Rule 10(b) requires "that discrete claims should be plead[ed] in separate counts.").

[26] In the Second Amended Complaint, Mathis alleges that in her conversation with Royle on June 17, 2009, she notified Royle that Lucas was also "being treated differently" because of her "sex or gender." See Second Amended Complaint ¶ 8.  As such, in the Motion, the City also argues that Mathis's allegations regarding Hedges's discriminatory treatment of Lucas do not constitute an adverse employment action against Mathis or evidence of discrimination against Mathis.  See Motion at 18.  Mathis does not address this allegation in her Response except for what appears to be a suggestion that "Chief Hedges and the St. Augustine Beach City Council were recklessly indifferent to gender discrimination in the SABPD" in violation of 42 U.S.C. § 1983.  Response at 19 n.10 (citing Lucas's deposition testimony).  Thus, to the extent Mathis relies on allegations of discrimination towards Lucas to support her claim of intentional discrimination, such argument is deemed abandoned.  Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000).  To the extent Mathis relies on these allegations to support a claim under § 1983, this claim is improperly raised for the first time in response to a motion for summary judgment.  See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1313 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  We hold it cannot.") (footnote omitted).  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule] 15(a).  A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."  Id. at 1315 (citation omitted).

to whether Mathis has established a genuine dispute of material fact on her claim that her termination was the product of intentional discrimination.[27]

The parties do not dispute that Mathis, a woman, was a member of a protected class. Further, the City does not contest that Mathis was qualified for the job she held.  Moreover, Mathis's termination constitutes an adverse employment action.  See e.g., Blue v. Dunn Const. Co., 453 F. App'x 881, 884 (11th Cir. 2011) (citing Crawford, 529 F.3d at 970).  However, with respect to Mathis's termination, the City does not address the fourth prong of Mathis's prima facie case, that Hedges treated similarly situated employees who are not female more favorably.[28]  See Rice-Lamar, 232 F.3d at 842-43.  Instead, the City argues that Mathis cannot show that the City's proffered reason for Mathis's termination is pretext for

---

[27] However, to the extent Mathis bases her sex discrimination claims on the additional alleged adverse employment actions, the Court determines that these claims fail as a matter of law.  First, Mathis alleges that "[p]rior to her hire, Chief Richard Hedges . . . expressed reluctance to hire Ms. Mathis when the only remaining candidate, a male, withdrew from consideration" and that "Chief Hedges initially wanted to re-advertise the position" but was convinced not to do so.  Second Amended Complaint ¶ 6.  Although there is evidence regarding Hedges's "reluctance" to hire Mathis given his own admission that he initially wanted to repost the position, see Hedges Dep. at 60, such reluctance does not constitute an adverse employment action because Mathis was ultimately hired.  See Davis, 245 F.3d at 1238.

Next, Mathis alleges that "[d]uring the course of Plaintiff's employment, Chief Hedges was often demeaning and confrontational to Assistant Chief Mathis, as contrasted to his communications with male subordinate officers."  See Second Amended Complaint ¶ 7.  Mathis testified to Hedges's unfriendly and perhaps, at times, rude behavior towards her in the workplace.  See Mathis Dep. at 82, 87-88, 89-91, 94, 108.  Although the FCRA's protection extends to adverse employment actions that fall short of ultimate employment decisions like discharge, see Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998), not every "unkind act" can violate the FCRA, see Wu v. Thomas, 996 F.2d 271, 273 n.3 (11th Cir. 1993).  Here, Hedges's behavior towards Mathis does not rise to the requisite level of substantiality because it had no effect on Mathis's compensation, terms, conditions, or privileges of employment and thus does not constitute an adverse employment action for purposes of the FCRA.  Wideman, 141 F.3d at 1456.

With regard to Mathis's allegation concerning Hedges's initiation of the internal investigation, to the extent the mere initiation of an internal investigation constitutes an adverse employment action, the evidence establishes that Hedges ordered the investigation as a direct result of the events which occurred on May 26, 2009.  Mathis has presented no evidence that this investigation was motivated by discriminatory animus.

[28] Instead, the City appears to argue that Mathis's comparator evidence fails to establish a prima facie case with respect to her claim of discrimination based on the conversion of her paid administrative leave to leave without pay.  See Motion at 18-20.

discrimination.  See Motion at 20-21.  Specifically, the City has come forward with a

legitimate, non-discriminatory business reason for Mathis's termination -  her violation of

SABPD policy and her failure to keep Hedges informed.  Id. at 21.  Thus, the Court's task is

to determine whether there is a genuine issue of material fact as to the question of pretext

with regard to the City's proffered reason for Mathis's termination.

　　　In order to show pretext, a plaintiff must "demonstrate that the proffered reason was

not the true reason for the employment decision."  Burdine, 450 U.S. at 256.  A reason

cannot be a "pretext for discrimination unless it is shown both that the reason was false, and

that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515

(1993) (emphasis and quotation omitted).  Thus, the plaintiff must show not only that the

employer's employment decisions were not for the stated reason, but also that they were in

fact motivated by discriminatory animus.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079,

1092 (11th Cir. 2004).  So long as the employer's "reason is one that might motivate a

reasonable employer, [the] employee must meet that reason head on and rebut it, and [she]

cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI

Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); see also Holland, 677 F.3d at 1055; Wilson,

376 F.3d at 1088.  In this regard, an "'employer may [take action against] an employee for

a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as

long as its action is not for a discriminatory reason.'"  Walton v. Cives Corp., 491 F. App'x 29,

32 (11th Cir. 2012) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187

(11th Cir. 1984)).  To this end, a plaintiff may demonstrate that an employer's reason is

pretextual by identifying "'weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions'" in the employer's rationale. Holland, 677 F.3d at 1055-56. However, rebuttal requires "significant probative" evidence of pretext; conclusory allegations alone are insufficient. See Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). Additionally, while the presence of a comparator is not an element of a claim of sex discrimination, Holland, 677 F.3d at 1063 n.7, the presence or absence of a comparator is relevant, as is other circumstantial evidence, to whether an employee has proven that the adverse job action was the result of discrimination. Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1154 (11th Cir. 2005); see also Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination").

In the Response, Mathis argues that she "has met her burden to establish a prima facie case and has presented evidence which precludes summary judgment including Hedges [sic] discriminatory comments, evidence of disparate treatment, Hedges [sic] failure to follow the City's progressive discipline policy, and Hedges [sic] shifting rationales and false testimony." Response at 14-15. "A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson, 376 F.3d at 1088. Indeed, "[a] plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1329 (11th Cir. 2011). Although

the City has carried its burden of demonstrating a legitimate, non-discriminatory reason for terminating Mathis, Mathis has provided sufficient evidence of pretext to create a genuine issue of material fact.  Hedges's evolving rationales for Mathis's termination as evidenced by George's testimony regarding his conversation with Hedges and Hedges's testimony in the unemployment compensation hearing, his declaration, and his deposition, together with Hedges's failure to follow the City's progressive disciplinary and Hedges's comment - "That's what I get for hiring a woman" - made to George and Tuttle, are sufficient to raise a genuine issue of material fact as to whether the City's proffered reason for Mathis's termination is pretext for discrimination.  As such, Mathis has provided sufficient evidence of pretext to allow her discrimination claims under the FCRA and § 1983 to survive summary judgment.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

### C.  Counts II and III: Retaliation under the Florida Civil Rights Act and 42 U.S.C. § 1983

Preliminarily, the Court observes that although Mathis alleges claims of retaliation against the City in violation of the FCRA and the Equal Protection Clause, see Second Amended Complaint ¶¶ 18-22, 36-37, "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause." Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997); see also Ratliff v. DeKalb Cnty., Ga., 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a first amendment right and as a statutory

right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation.") (emphasis in original).  Accordingly, Mathis's claim of retaliation under 42 U.S.C. § 1983 fails as a matter of law, and Count III is due to be dismissed to the extent that Mathis seeks damages under § 1983 based on a claim that her termination was retaliatory.

Turning to the merits of Mathis's retaliation claim under the FCRA, Mathis alleges that the City retaliated against her in violation of the FCRA by initiating and continuing an internal affairs investigation and terminating her employment due to her complaints regarding the City's discriminatory practices.  See Second Amended Complaint ¶ 21; Response at 15 n.6. The record establishes that after Bolante's investigation began, and after he alerted Mathis that he would be questioning her soon, Mathis complained to Royle that "she felt that she was being singled out and treated differently" by Hedges "because of her gender." See Royle Decl. ¶ 8.[29]  "Statutorily protected expression includes internal complaints of discrimination to superiors[.]"  Walton-Horton v. Hyundai of Ala., 402 F. App'x 405, 408 (11th Cir. 2010) (citing Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001)).  Thus, by voicing her complaints of gender discrimination to Royle, Mathis engaged in protected activity under the FCRA.  See Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 715 n.2 (11th Cir. 2002) ("Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'") (quoting Rollins v. Fla. Dep't of Law Enforcement, 868 F.2d

---

[29] The record is unclear as to whether Mathis also expressed her concerns of sex discrimination to Hedges or whether she simply told Hedges she wished to speak to Royle.  See Hedges Decl. ¶ 18.

397, 400 (11th Cir. 1989)); see also Jones v. City of Lakeland, 318 F. App'x 730, 736 (11th Cir. 2008) (noting in regards to FCRA and Title VII claims that the phrase "protected activity" includes informal complaints to an employee's supervisors).   Thus, Mathis's verbal complaints serve as protected activity sufficient to satisfy the first element of Mathis's prima facie case.

The second prong of Mathis's prima facie requires proof that she suffered an adverse employment action.  See Crawford, 529 F.3d at 970.  Mathis cannot establish a prima facie case of retaliation with respect to Hedges's "initiating and continuing an internal affairs investigation" because the mere initiation of an internal affairs investigation against an employee is not a "materially adverse" action.  See Rademakers v. Scott, 350 F. App'x 408, 412-13 (11th Cir. 2009) affirming No. 2:07-cv-718, 2009 WL 3459196, at *2, *4 (M.D. Fla. Jan. 22, 2009) ("An investigation into alleged misconduct is not such adverse employment action and cannot support [plaintiff's] retaliation claim."); Rogers v. Ga. Dep't of Corr., No. 5:10-CV-499 (MTT), 2012 WL 5398804, at *7, *11 (M.D. Ga. Nov. 2, 2012) ("[T]he Eleventh Circuit has held that initiation of an internal investigation against an employee does not constitute an adverse employment action.").  However, the City does not appear to dispute that Mathis's termination constitutes an adverse employment action for purposes of Mathis's prima facie case of retaliation.  Accordingly, the Court will address the causal connection prong of Mathis's prima facie case.

The City argues that there is no evidence of a causal connection between Mathis's complaints of gender discrimination and her termination because it was only after Bolante's investigation began, and after Bolante informed her of the phone records, that she reported

discrimination for the first time.   Motion at 22-23.   To satisfy the causal connection requirement of a prima facie case, the Supreme Court recently clarified that a Title VII plaintiff must demonstrate "but-for" causation to sustain a retaliation claim.   Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013); see also Smith v. City of Fort Pierce, Fla., 565 F. App'x 774, 778 (11th Cir. 2014) (applying the Nassar 'but-for' causation standard to claims of retaliation under Title VII and the FCRA).   "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."   Nassar, 133 S.Ct. at 2533.   In the Response, Mathis argues that she has established a causal connection "through temporal proximity and other evidence that proves that her protected complaint was not wholly unrelated to the adverse action she suffered." Response at 15 n.6.

Mathis voiced her complaints of sex discrimination on June 17, 2009, and Hedges terminated her employment on October 27, 2009.   First, the Court observes that "mere temporal proximity, without more, must be 'very close.'" Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).   "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."   Id.; see also Faircloth v. Herkel Invs. Inc., 514 F. App'x 848, 852 (11th Cir. 2013) (no inference of causation based on three-month gap).   Additionally, in considering whether Mathis has established a causal connection, the Court is mindful of the Nassar Court's rationale in adopting a "but-for" causation standard: A lesser causation standard could "contribute to the filing of frivolous claims" such as where an employee knows he is about to suffer an adverse employment action and in order to "forestall" that adverse action, the employee may be

tempted to make an "unfounded" charge of unlawful discrimination only to allege retaliation once the impending adverse employment action occurs.  Nassar, 133 S.Ct. at 2531-32.  As such, the Court is particularly doubtful of Mathis's ability to establish a causal connection between her protected activity and her termination where her complaints came on the heels of the initiation of the internal investigation, the results of which ultimately lead to her termination.  Ultimately, however, Mathis cannot establish that her protected activity was the but-for cause of her termination because the City has proffered a legitimate, non-discriminatory reason for Mathis's termination - Mathis's violations of City policy and Mathis's failure to keep Hedges informed - and Mathis has not rebutted this proffered reason with any evidence that the City terminated her based on a retaliatory reason.  See Smith, 565 F. App'x at 779.[30]  Accordingly, Mathis's retaliation claim fails as a matter of law, and Count II is due to be dismissed.[31]

In accordance with the foregoing, it is

**ORDERED**:

1.      Defendant's Amended Motion for Summary Judgment (A Dispositive Motion) with Supportive Memorandum of Law (Doc. 28) is **GRANTED, in part, and DENIED, in part**.

---

[30] Unlike her gender discrimination claim in support of which Mathis presents evidence that in discussing his decision to terminate Mathis's employment, Hedges stated, on more than one occasion, "That's what I get for hiring a woman", Mathis points to no evidence that the true reason for her termination was retaliation for her complaining to Royle about gender discrimination.

[31] As such, the Court declines to reach the City's argument that Mathis failed to properly report her claims of discrimination.  Motion at 23-24.

      A.     Defendant's Motion is **GRANTED** as to Count II of the Second Amended Complaint and also the portion of Count III in which Mathis asserts a claim of retaliation pursuant to 42 U.S.C. § 1983.

      B.     In all other respects, Defendant's Motion is **DENIED**.

2.     Upon completion of the trial of Mathis's remaining claims, the Court will direct the Clerk of Court to enter **JUDGMENT** in favor of Defendant City of St. Augustine Beach and against Plaintiff Joni Mathis as to Count II of the Second Amended Complaint and as to Mathis's claim of retaliation pursuant to 42 U.S.C. § 1983 as presented in Count III.

**DONE AND ORDERED** in Jacksonville, Florida, this 31st day of March, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc18
Copies to:
Counsel of Record